

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-2-2007

# Univ Pgh v. USA

Precedential or Non-Precedential: Precedential

Docket No. 06-1276

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Univ Pgh v. USA" (2007). *2007 Decisions.* Paper 163.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/163

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-1276
_____

UNIVERSITY OF PITTSBURGH

v.

UNITED STATES OF AMERICA,

<u>Appellant</u>

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 04-cv-1616; 05-cv-00499)

District Judge: Honorable Donetta Ambrose

_____

Argued January 23, 2007

Before: SCIRICA, <u>Chief Judge</u>, FUENTES, and CHAGARES,
<u>Circuit Judges</u>.

(Filed:  November 2, 2007)

_____
Ellen P. DelSole (Argued)
Kenneth L. Green
Eileen J. O'Connor
United States Department of Justice

1

Tax Division
Post Office Box 502
Washington, D.C. 20044

Attorneys for Appellant

Andrew K. Fletcher (Argued)
Pepper Hamilton
500 Grant Street, 50th Floor
Pittsburgh, Pennsylvania 15219

Kathryn M. Kenyon
Pietragallo, Bosick & Gordon
301 Grant Street
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219

Attorneys for Appellee

_____

OPINION
_____

FUENTES, Circuit Judge.

The issue in this case is whether early retirement payments made by the University of Pittsburgh (the University) to its tenured faculty are taxable as "wages" under the Federal Insurance Contribution Act (FICA), 26 U.S.C. § 3121-28. From 1996 to 2001, the University paid over $2 million in FICA taxes on these payments. In 2001, however, it sought a refund from the Internal Revenue Service (IRS), on the ground that the early retirement payments were not "wages," but instead were "buy outs" not subject to FICA taxes. The IRS denied the refund, and the University filed this action in the District Court for the Western District of Pennsylvania. The District Court granted the University's motion for summary judgment, concluding that the payments were not wages, and denied the government's cross-motion for summary judgment. This appeal followed.

2

Because we agree with the government that the retirement payments are within the Act's definition of wages we will vacate the District Court's grant of summary judgment, and remand for entry of judgment in favor of the government.[1]

## I.   BACKGROUND

The following facts are not disputed.  Between 1982 and 1999, the University offered five successive Early Retirement Plans (the Plans) to tenured faculty members and administrators, as well as non-tenured librarians whose contracts provided an "expectation of continued employment."  Payments under all five Plans were made monthly, and were based on an employee's salary at the time of retirement, as well as length of service to the University.  In four of the Plans, participation was limited to covered employees with at least ten years of service, between the ages of sixty-two and sixty-nine years old.  In the fifth Plan, participation was limited to employees with twelve years of service, who were at least sixty years old, or whose sum of service and years of age equaled at least eighty-five.  To participate, employees were required to execute an irrevocable Contract for Participation.  Employees who held tenure were required to relinquish their tenure rights.

> Pursuant to University policy, "tenure" constitutes recognition by the University that a person so identified is qualified by achievements and contributions to knowledge as to be ranked among the most worthy of the members of the faculty engaged in scholarly endeavors:  research, teaching, professional training, or creative intellectual activities of other kinds.

---

[1]   We exercise plenary review over a district court's summary judgment ruling.  Mortellite v. Novartis Crop Prot., Inc., 460 F.3d 483, 488 n.3 (3d Cir. 2006).  "[T]he taxpayer bears the ultimate burden of proving, by a preponderance of the evidence, that [the IRS's] assessment is erroneous."  Francisco v. United States, 267 F.3d 303, 319 (3d Cir. 2001) (internal quotation marks omitted).

3

(App. at 160-61, 181.) A non-tenured faculty member can serve without tenure for a maximum of seven years (with some exceptions not relevant here). After seven years, a faculty member can be terminated for failing to meet the requirements for tenure, or be granted tenure at the discretion of the Chancellor and the Chief Executive of the University.

According to the University, tenure fosters an environment of free inquiry because, once conferred, it affords faculty "rights and immunities," including immunity from termination except for cause or financial exigency. (Univ. Br. at 3.) The University also may not terminate a tenured faculty member without a hearing that comports with standards of procedural due process under the Fourteenth Amendment. See Bd. of Regents v. Roth, 408 U.S. 564, 576-77 (1972); McDaniels v. Flick, 59 F.3d 446, 454 (3d Cir. 1995).

As noted above, the University paid over $2 million in FICA taxes on payments under the Plans between 1996 and 2001. On November 19, 2001, the University filed claims with the IRS for refunds totaling $2,196,942, the total amount of the University's FICA tax payments since 1996, including employee-paid portions. Employees who participated in the Plans consented to have the University seek a refund on their behalf.

On October 30, 2002, the IRS denied the refund request, and on October 21, 2004, the University filed this suit in the District Court.[2] The parties filed cross-motions for summary

---

[2] The District Court had jurisdiction over refund claims pursuant to 26 U.S.C. § 6532 and 28 U.S.C. § 1346(a)(1). The University initially commenced two separate refund actions. In the first action, the University sought a refund of FICA taxes paid between January 1, 1996 and December 31, 2000. In a second action, filed on April 15, 2005, the University sought a refund of FICA taxes paid from January 1, 2001 to June 30, 2001. In an Order entered May 13, 2005, the District Court consolidated the two cases under this caption, and directed that the second case be closed.

4

judgment, which the Court referred to Magistrate Judge Robert Mitchell. The Magistrate Judge recommended granting the University's motion with respect to Plan payments to tenured employees, but recommended granting the government's cross-motion with respect to Plan payments to non-tenured librarians.

On November 22, 2005, the District Court adopted the Magistrate Judge's Report and Recommendation, granting each party's motion for summary judgment in part, and denying each in part. The Court entered judgment in favor of the University in the amount of $2,088,358, plus statutory interest. Only the government appealed.[3]

## II.    LEGAL FRAMEWORK

### A.    "Wages" Under FICA

The purpose of FICA taxes, as distinct from income taxes, is to "fund a national system of social insurance that supports important and extensive social security and medicare health programs." Temple Univ. v. United States, 769 F.2d 126, 130 (3d Cir. 1985). FICA taxes include a tax to fund old-age, survivors, and disability insurance, and a tax to fund hospital insurance. See 26 U.S.C. §§ 3101, 3111. In Temple we cited the Senate's comments explaining the underlying purpose of FICA:

> "The social security program aims to replace the income of beneficiaries when that income is reduced on account of retirement and disability. Thus, the amount of 'wages' is the measure used both to define income which should be replaced and to compute FICA tax liability. Since the security system has objectives which are significantly different from the objective underlying the income tax withholding rules, the committee believes that amounts exempt from

---

[3] The University does not appeal the determination that the payments to non-tenured librarians were subject to FICA taxes.

income tax withholding should not be exempt from FICA unless Congress provides an explicit FICA tax exclusion."

769 F.2d at 130 (quoting S. Rep. No. 23, 98th Cong., 1st Sess. 41, reprinted in 1983 U.S.C.C.A.N. 143, 183).

Under the Internal Revenue Code, employers and employees are liable for payment of FICA taxes on all "wages" that are received by an employee "with respect to employment." See 26 U.S.C. §§ 3101(a)-(b). Section 3121(a) defines "wages" subject to FICA taxes as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash."[4] Section 3121(b) defines "employment" as "any service, of whatever nature, performed . . . by an employee for the person employing him."[5]

The Supreme Court has interpreted the term "employment"—a component of the definition of wages—broadly: "The very words *any service . . . performed . . . for his employer*, with the purpose of the Social Security Act in mind import breadth of coverage." See Social Sec. Bd. v. Nierotko, 327 U.S. 358, 365 (1946) (internal quotation marks omitted) (emphasis added). Nierotko concluded, specifically, that "service" in the phrase "any service performed" means not only work actually performed, but also "the entire employer-employee relationship for which compensation is paid to the employee by the employer." Id. at 365-66. Applying this interpretation, Nierotko held that "back pay" awarded under the National Labor Relations Act to a wrongfully discharged employee had to be taxed as wages under the Social Security Act.[6] See id. at 364.

---

[4] Section 3121(a) lists a number of exceptions to the "wages" category, none of which applies here.

[5] Section 3121(b) also lists a number of exceptions to this definition, none of which applies here.

[6] In FICA Congress retained the definition of wages contained in the Social Security Act of 1935, essentially

Treasury regulations further provide that "[t]he name by which . . . remuneration for employment is designated is immaterial." 26 C.F.R. § 31.3121(a)-1(c). Thus, for example, "salaries, fees, bonuses, and commissions on sales or on insurance premiums, are wages if paid as compensation for employment." Id. Likewise, "the basis upon which the remuneration is paid is immaterial in determining whether the remuneration constitutes wages." Id. at § 31.3121(a)-1(d). For example, "it may be paid on the basis of piecework, or a percentage of profits; and it may be paid hourly, daily, weekly, monthly, or annually." Id. Unless remuneration for employment is specifically excepted, it "constitutes wages even though at the time paid the relationship of employer and employee no longer exists between the person in whose employ the services were performed and the individual who performed them." Id. at § 31.3121(a)-1(i).

### B.     Relevant IRS Revenue Rulings

Both parties rely on IRS revenue rulings interpreting the Code and regulations to support their characterization of the Plan payments. We have explained that "although revenue rulings are entitled to great deference, . . . courts may disregard them if they conflict with the statute they purport to interpret or its legislative history, or if they are otherwise unreasonable." Reese Bros., Inc. v. United States, 447 F.3d 229, 237-38 (3d Cir. 2006); see also United States v. Mead Corp., 533 U.S. 218, 228 (2001) ("The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.") (internal quotation marks omitted). Neither party challenges the validity of the applicable revenue rulings, but they dispute which among them is most analogous to this case.

---

unchanged. See Rowan Cos., Inc. v. United States, 452 U.S. 247, 255, 256 n.11 (1981)

7

The University relies principally upon Revenue Ruling 58-301. In that Ruling an employer and employee entered a five-year employment contract, which both parties agreed to cancel in the second year. See Rev. Rul. 58-301, 1958-1 C.B. 23. In consideration of the employee's relinquishment of his contract rights—which had been negotiated at the outset of the employment relationship—the employer paid the employee a lump sum. Id. The IRS held that "a lump sum payment received by an employee as consideration for the cancellation of his employment contract . . . is not subject to the [FICA] tax." Id. The University argues that Plan payments were made in consideration for its employees' relinquishment of their prospective contract rights and are therefore not wages, like the payments in Ruling 58-301.

In response, the government points to three subsequent Revenue Rulings that distinguish and limit the applicability of Ruling 58-301. First, it cites Revenue Ruling 74-252, which involved a three-year contract providing that the employer could terminate the employee during the term of the contract if it paid the employee an amount equal to six months' salary. See Rev. Rul. 74-252, 1974-1 C.B. 287. The employer terminated the contract before it expired, and paid the required sum under the contract in monthly payments. Id. The IRS deemed these "dismissal payments" that were "made pursuant to the provisions of the contract rather than as consideration for the relinquishment of [property] interests" and, on this basis, concluded that the payments were wages under FICA. Id. The IRS distinguished Ruling 58-301 as involving "consideration for the cancellation of the employment contract," rather than dismissal payments provided for *as part of* the employment contract.

Second, the government cites Revenue Ruling 75-44, in which a railroad employee received a lump sum payment as consideration for relinquishing seniority rights that he earned under his employment contract. See Rev. Rul. 75-44, 1975-1 C.B. 15. The employee acquired the rights, including the right to security in his employment, based on longevity, but he remained an "at will" employee. Id. The IRS determined that the lump sum payment constituted taxable wages, and

8

distinguished Ruling 58-301:

> In the instant case, the employee had *acquired his relinquished employment rights through his previous performance of services* whereas in Rev. Rul. 58-301, the contractual rights relinquished were *acquired in the original negotiation of the contract canceled.* In Rev. Rul. 58-301, the lumpsum payment was primarily in consideration of the cancellation of the employee's original contract rights rather than primarily in consideration of the past performance of services through which the relinquished employment rights were acquired.

Id. (emphasis added).

Finally, the government directs our attention to Revenue Ruling 2004-110, 2004-50 C.B. 960, in which the IRS modified and superceded Ruling 58-301. Ruling 2004-110 held that payments to an employee for cancellation of the employment contract and relinquishment of contract rights are wages subject to FICA taxes. After reviewing these rulings, in addition to several others, the IRS reasoned that:

> [e]mployment encompasses the establishment, maintenance, furtherance, alteration, or cancellation of the employer-employee relationship or any of the terms and conditions thereof. *If the employee provides clear, separate, and adequate consideration for the employer's payment that is not dependent upon the employer-employee relationship and its component terms and conditions, the payment is not wages for purposes of FICA. . . .*

> Under the facts presented in this ruling, the employee receives the payment as consideration for canceling the remaining period of his employment contract and relinquishing his contract rights. As such, the payment is part of the

9

compensation the employer pays as remuneration
for employment.

Id. Ruling 2004-110 limited Ruling 58-301 to its facts and to
payments made before January 12, 2005. Id.

### C. The Circuit Split

This case presents an issue of first impression in our
Court. Two other Courts of Appeals have addressed these
precise questions, however, and have reached contrary
conclusions. The University relies on North Dakota State Univ.
v. United States, 255 F.3d 599 (8th Cir. 2001), which held that
early retirement payments to faculty who were required to
relinquish their tenure rights, *were not* wages under FICA. The
government relies on Appoloni v. United States, 450 F.3d 185
(6th Cir. 2006) which held that early retirement payments made
to public school teachers, who relinquished their statutory tenure
rights, *were* wages under FICA.

In North Dakota State, the Eighth Circuit determined that
a university's early retirement payments were made "in
exchange for the relinquishment of [the faculty's] contractual
and constitutionally-protected tenure rights rather than as
remuneration for services to [the University]." 255 F.3d at 607.
After examining the relevant revenue rulings, the court reasoned:

> Under the terms of [North Dakota State's] Early
> Retirement Program, the tenured faculty received a
> negotiated amount of money in exchange for . . .
> their tenure rights. They did not receive what they
> were entitled to under their contracts, which was
> continued employment absent fiscal constraints or
> adequate cause for termination. Rather, they gave
> up those rights, making this case more analogous
> to Revenue Ruling 58-301 than to Revenue Ruling
> 74-252.

Id. at 607.

The District Court adopted this reasoning, holding that

10

"payments made by the University . . . under the Retirement Plans are not subject to FICA taxes . . . because, as in [North Dakota State], the payments are analogous to Rev. Rul. 58-301, in that they were made in exchange for the relinquishment of contractual and constitutionally-protected tenure rights rather than as remuneration for services to the University."  (App. at 11-12.)

Subsequent to the District Court's decision, the Sixth Circuit declined to follow North Dakota State.  See Appoloni, 450 F.3d 185.  Appoloni summarized its reasoning as follows:

> [W]e find [it of] great significance that the tenure rights at issue were earned through service to the employer.  This is for two reasons.  First, we see no reason to differentiate tenure rights from any other right an employee earns through service to any employer. . . . [C]ourts have found the relinquishment of seniority rights, rights to bring suit, and other types of rights in exchange for a severance payment constitute FICA wages.  Secondly, because these rights were earned through service rather than contracted for at the time of employment, this suggests Rev. Rul. 75-44 is more on point than Rev. Rul. 58-301.

> We also want to again emphasize the importance of the school district's principal purpose in offering these severance payments.  The school district's purpose here was not to "buy" tenure rights.  It was to induce those at the highest pay scales to voluntarily retire early.  Relinquishment of tenure rights was incidental to the acceptance of the severance payment.  A school district could not offer an early retirement payment and permit the teacher to keep his/her tenure and remain employed.

450 F.3d at 19596 (footnote and citations omitted).

11

## III. ANALYSIS

The weight of authority holds that compensation paid to an employee for services to her employer constitutes wages under FICA regardless of whether it is prospective (for lost earning potential), or retrospective (as a reward for past service).[7] For the following reasons, we conclude that the relinquishment of tenure rights—although a condition precedent to the payments—does not alter the Plan payments' character as compensation for services, and therefore as wages.

First, the eligibility requirements for payments under the Plans are linked to past services at the University, not relinquishment of tenure. As <u>Appoloni</u> explained, "[i]n determining whether a payment constitutes wages, courts have looked to eligibility requirements, specifically longevity, as an

---

[7] <u>See, e.g.</u>, <u>Nierotko</u>, 327 U.S. at 365-66 (remuneration for employment includes "not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer"); <u>Appoloni</u>, 450 F.3d at 190 ("The holding in <u>Nierotko</u> clearly supports the conclusion that awards representing a loss in wages, both back wages and future wages, that otherwise would have been paid, reflect compensation paid to the employee because of the employer-employee relationship, regardless of whether the employee actually worked during the time period in question."); <u>Assoc. Elec. Coop., Inc. v. United States</u>, 226 F.3d 1322, 1328 (Fed. Cir. 2000) (holding that payments to employees under voluntary "early out" plan were related in part to the employees' prior service to Associated and, for this and other reasons, were taxable as wages); <u>Gerbec v. United States</u>, 164 F.3d 1015, 1026 (6th Cir. 1999) (determining that compensation for lost "back wages" or "future wages" is taxable under FICA); Rev. Rul. 75-44, 1975-1 C.B. 15 (holding that payments for relinquishment of seniority rights acquired through employee's provision of past services are wages); <u>cf. North Dakota State</u>, 255 F.3d at 606 (characterizing tenure as the start of a new employment relationship, not payment in kind for past services, and therefore not taxable as wages).

important factor." 450 F.3d at 191.[8] In this case, there is no dispute that eligibility for the Plans, for *both* tenured and non-tenured Plan participants, was based on the employee's age and years of service. These requirements link the Plan payments to past services for the employer, not the specific rights being relinquished, and weigh heavily in favor of treating the payments as wages.[9]

---

[8] See also Associated Electric, 226 F.3d at 1328 (noting that while the method of computing severance payments, including the length of service and pay rate, were not "dispositive," the method is "a relevant factor in determining whether the payments constitute 'wages'"); Abrahamsen v. United States, 228 F.3d 1360, 1365 (Fed. Cir. 2000) (stating, where employee's severance payments were derived from a formula based on the employee's salary and years of service, that this "associate[d] the payments with the employer-employee relationship" and strongly supported the holding that payments were wages); Hemelt v. United States, 122 F.3d 204, 210 (4th Cir. 1997) ("[K]ey factors in determining the amounts of each award were the length of each employee's tenure with Continental and the salary he received from Continental. . . . [B]ecause the payments from Continental to taxpayers and other class members arose out of their employment relationship, they fit within the statutory and regulatory definition of wages . . . ."); Sheet Metal Workers Local 141 v. United States, 64 F.3d 245, 250-51 (6th Cir. 1995) (holding that distributions from a union unemployment benefit fund were wages because eligibility was contingent on employees' length of service, and because "eligibility requirements provide the *most accurate* test to determine whether a payment is truly in consideration for services").

[9] This is arguably different than the plans described in North Dakota State, for which "past performance and current salary were not the only factors considered in determining the amount of early retirement payments; in fact there was *no limit* on what factors could be considered." 255 F.3d at 607 (emphasis added). Here, even assuming the University could have relied on other eligibility requirements, it chose to rely on ones that suggest the Plan payments were wages.

13

Second, the Plans themselves make clear that the payments were viewed as compensation for service to the University.  For example, the face of the 1998-2002 Plan reveals that an important motivation for the Plans was to keep the University's compensation package competitive with peer universities.  See University Board of Trustees Resolution Approving Implementation of 1998-1999 Retirement Plans, App. at 159, 256 (resolving that 1998-2002 plan would be last plan approved because the University "does have a favorable retirement plan compared to peer universities").  Also, the 1983 Plan states that, in addition to making room for new faculty, the University offered the Plan because it "deem[ed] it desirable and appropriate to provide maximum flexibility and opportunities for its faculty members to retire voluntarily prior to the mandatory retirement age."  App. at 209.  Subsequent plans state a similar desire to reward valued faculty members.

To the extent the payments are a reward for service—as the Plans themselves indicate—they qualify as wages: "Payments for hard work and faithful service arise directly from the employee-employer relationship and are payments which recognize the value or character of the services performed for the employer."  Associated Electric,  226 F.3d at 1327 (finding manager's testimony that early out payments were "the right thing to do [because] [t]hese people had worked hard, and were good people," indicated payments were reward for past service and therefore wages) (second alteration in original).

Third, even if the University made the payments *in part* to secure relinquishment of tenure rights, their main purpose was to provide for employees' early retirement.  In this way, they were indistinguishable from severance payments, which are generally taxed as wages.  In this regard, we agree with the Sixth Circuit's statement in Appoloni that it

> fail[ed] to see how this is different from other
> severance packages just because a "tenure" right
> was exchanged.  In almost all severance packages
> an employee gives up something, and we have a
> hard time distinguishing this case from similar

14

cases where an employee, pursuant to a severance package, gives up rights in exchange. Courts have consistently held that severance payments for the relinquishment of rights in the course of an employment relationship are FICA wages. In fact, we are at a loss to find a case, other than the Eighth Circuit's decision, to hold otherwise.

450 F.3d at 193. This reasoning is consistent with numerous cases treating payment for the relinquishment of rights gained over the course of employment—including severance packages requiring waiver of all rights to sue—as wages.[10]

The University seeks to distinguish these accrued-seniority and severance cases on the ground that the employees had "at will" employment contracts, whereas here, "tenure is obligatory for the University, optional with the faculty member."

---

[10] See, e.g., Abrahamsen, 228 F.3d at 1364-65 ("[T]he payments at issue were at least partially motivated by IBM's desire to settle any claims [of] departing employees . . . . The employees, however, have failed to demonstrate that . . . they constituted settlement payments instead of severance payments made to compensate for the employer-employee relationship."); id. at 1362 (describing the breadth of employees' release of claims "arising from the Age Discrimination in Employment Act of 1967, as amended, Title VII of the Civil Rights Acts of 1964, as amended, and any other federal or state law dealing with discrimination in employment on the basis of sex, race, national origin, religion, disability, or age;" as well as "claims based on theories of contract or tort, whether based on common law or otherwise"); Associated Electric, 226 F.3d at 1328 (determining that payments made to union employees "in exchange for valuable rights, i.e., the union's promise not to strike," were FICA wages); CSX Corp. v. United States, 52 Fed. Cl. 208, 221 (Fed. Cl. 2002) (declining to follow North Dakota State and explaining that "[b]ecause . . . rights [to vacation pay, sick pay, layoff pay, and seniority] . . . are integral to the employment relationship—they are part and parcel of the job protections and job benefits . . . [and therefore] they must be considered wages").

15

(Univ. Br. at 4; App. at 202.) This distinction misses the point. Regardless of whether an employee voluntarily ended the employment relationship, or whether the employee had a due process right to maintain his employment, the rights relinquished were gained through the employee's past services to the employer.

In this way, the tenure rights relinquished in this case are most like the seniority rights relinquished in Revenue Ruling 75-44. That Ruling drew an important distinction between payments made for relinquishment of contract rights acquired at the negotiation of a contract (as in Ruling 58-301), which are not FICA wages, and payments for the relinquishment of rights acquired over the duration of an employment contract (as in Ruling 75-44), which are FICA wages. The Plan payments here compensate employees for relinquishment of tenure rights acquired through past service, and for this reason are most like the payments in Ruling 75-44.[11]

Fourth, and relatedly, we reject the University's suggestion that because tenure is wholly discretionary and affords new rights to the recipient, it is necessarily the start of a new employment relationship, like the five-year contract in Revenue Ruling 58-301. The University's policy on "Appointment and Tenure" shows that the award is contingent on past performance and is more like a promotion than an entirely new contract:

> Academic tenure is a status accorded *members of the University faculty who have demonstrated high ability and achievement* in their dedication to growth of human knowledge.

---

[11] Because this case does not present facts that are "substantially the same" as the facts in Ruling 58-301—most notably, the rights at issue were earned over the course of a long employment relationship, not at the outset of the relationship—we are free to consider and afford some deference to the reasoning in Ruling 2004-110. We need not do so, however, because Ruling 75-44 provides sufficient guidance.

> Tenure is intended to assure the University that there will be *continuity in its experienced faculty and in the functions for which they are responsible*.
>
> *Promotion to tenured rank constitutes recognition* by the University that a person so identified is qualified by achievements and contributions to knowledge as to be ranked *among the most worthy of the members of the faculty engaged in scholarly endeavors*.

(App. at 193-94) (emphasis added).[12] The fact that tenure is awarded on a very limited, discretionary basis does not change the fact that it is awarded based on service to the University. In this regard, we agree with Appoloni that courts

> must not look simply at what is being relinquished at the point a severance payment is offered, but rather, *how the right relinquished was earned*. Thus, we cannot understate the importance of the fact that a teacher earns tenure by successfully

---

[12] According to the University's policy on tenure, individuals from other universities may "[u]nder exceptional circumstances" receive an initial appointment as an associate professor or professor with tenure. See App. at 165 ¶ 4.6(h). However, it appears that service at another university does not satisfy the years of service requirement for participation in the Plans. See App. at 154, ¶ 1-5 (defining years of service, a requirement for Plan eligibility, as "each Contract Year with tenure or in the tenure stream *at the University of Pittsburgh* as completed by a Faculty Member") (emphasis added). This limitation on eligibility also suggests that the payments were based more on past service to the University than relinquishment of tenure status. See Associated Electric, 226 F.3d at 1328 (noting that employer's "desire to only compensate the employees for service to Associated and not to the mine, which would have allowed compensation for service to other employers," supported characterization of early out payments as wages).

completing a probationary period. In other words, a teacher does not obtain tenure at the onset of employment; it is a right that is earned like any other job benefit. Admittedly, the grant of this right is guaranteed and protected by statute. But we fail to see how the fact that this right is protected by statute takes away from the point that it still *must be earned through services to the employer*.

450 F.3d at 192-93 (citations omitted) (emphasis added).[13]

In sum, because tenure is a form of compensation for past services to the University, payments offered as a substitute for tenure are compensation and therefore taxable as wages. See 26 U.S.C. § 3121(a) ("[W]ages" includes "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash."); Appoloni, 450 F.3d at 195 ("Tenure rights were previously paid in kind—job security—and now are being paid in cash."); CSX, 52 Fed. Cl. at 221 ("Pursuant to [§ 3121(a)] . . . the value of the benefits and protections that each employee held in his or her position—rights to vacation pay, sick pay, layoff pay, and seniority—constituted part of the employee's total compensation package and, hence, constituted wages. Therefore, when these job-related benefits are relinquished in favor of a lump-sum payment, the transaction simply amounts to a redemption, paid in cash, of wage amounts previously paid in kind. . . . [W]hat were wages at the start remain wages at the end.").

---

[13] In Appoloni, tenure rights were earned automatically, whereas here, and in North Dakota State, they were awarded at the University's discretion. See 450 F.3d at 195 n.5 (quoting North Dakota State, 255 F.3d at 601). Appoloni distinguished North Dakota State on this basis, but we do not think this distinction makes a difference, since it is clear in this case that, discretionary or not, the employee's rights were earned as a reward for their service to the University.

18

## III.    CONCLUSION

The record in this case shows that payments under the Plans were primarily in consideration for employees' past service to the University.  Relinquishment of tenure rights, while a condition precedent to the payments, was not the primary consideration that employees offered.  The payments therefore qualify as wages subject to FICA taxation.  Accordingly, we will vacate the District Court's entry of summary judgment in favor the University, and remand to the District Court for entry of summary judgment in favor of the government.


SCIRICA, *Chief Judge*, dissenting.

This case presents the question whether retirement payments the University of Pittsburgh ("University") made to former tenured faculty members were "wages" subject to FICA tax.  Although the matter is not free from doubt, I would hold the payments were not wages because they were given primarily in exchange for the faculty members' relinquishment of tenure, which is a property interest in continued employment absent cause or financial exigency.  *See North Dakota State Univ. v. United States*, 255 F.3d 599 (8th Cir. 2001).

The problem of defining "wages" in this case presents a contrast between two possible concepts of faculty tenure at the University.  Is tenure, as the Government contends, analogous to seniority rights and other benefits earned in the course of employment?  Or, as the University argues, does tenure mark the beginning of a new employment relationship distinct from prior service?  According to the first view, the payments at issue here were remuneration for employment and were subject to FICA tax.  According to the second view, the payments were not remuneration for employment, because they were given primarily in exchange for the relinquishment of property rights the faculty received at the beginning of the tenured relationship.  The District Court, following *North Dakota*, agreed with the University.  The majority reverses and adopts the Government's view.  I would affirm and follow *North Dakota*.

### I.

I would hold the payments made in exchange for the relinquishment of tenure by the University faculty members were not subject to taxation under the Federal Insurance Contribution Act (FICA) because they were not "wages" as that term is defined at 26 U.S.C. § 3121(a).

19

**A.**

The Internal Revenue Code requires employers and employees to pay taxes under FICA on all "wages" an employee receives "with respect to employment." 26 U.S.C. § 3101(a)-(b). "Wages" means "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." *Id.* § 3121(a). "Employment" is "any service, of whatever nature, performed . . . by an employee for the person employing him."[14] *Id.* § 3121(b). "Service," in turn, includes "not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer." *Soc. Sec. Bd. v. Nierotko*, 327 U.S. 358, 365-66 (1946). It is undisputed that the payments here were taxable income for ordinary income tax purposes. But not every item of income is wages subject to FICA taxation. *See Cent. Ill. Pub. Serv. Co. v. United States*, 435 U.S. 21, 25 (1978) (discussing the definition of "wages" and noting "many items qualify as income and yet clearly are not wages"). The question here is whether the payments were remuneration for employment.

The Government contends the early retirement payments are wages because they arise out of the employment relationship and are analogous to severance payments and payments for relinquishment of accrued seniority rights, which IRS rulings designate as wages. *See* Rev. Rul. 74-252, 1974-1 C.B. 287; Rev. Rul. 75-44, 1975-1 C.B. 15. The University argues the payments are not wages because they were given in exchange for the professors' relinquishment of enforceable property rights in tenure, and are analogous to "buy-outs" of unexpired contract rights – payments that, under another IRS ruling, are not wages. *See* Rev. Rul. 58-301, 1958-1 C.B. 23.[15]

**B.**

---

[14] The statute includes some exceptions, not relevant here, to the definitions of "wages" and "employment."

[15] As the majority notes, in Revenue Ruling 2004-110, 2004-2 C.B. 960, the IRS modified and superseded Revenue Ruling 58-301. But Revenue Ruling 2004-110 by its terms does not apply to payments made before January 12, 2005, in circumstances substantially the same as in Revenue Ruling 58-301. Since the payments at issue here occurred between 1996 and 2001, and the circumstances here are substantially the same as in Revenue Ruling 58-301, I would hold Revenue Ruling 2004-110 is inapplicable to the payments in this case.

20

The Fourteenth Amendment's Due Process Clause protects interests in property to which a person has a legitimate claim of entitlement. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Property is not limited to "actual ownership of real estate, chattels, or money," *id.* at 572, and it includes "interests that a person has already acquired in specific benefits." *Id.* at 576. We have recognized that tenured professors at public universities hold a property interest in their tenure, so that procedural due process is necessary when the university seeks to dismiss a tenured professor. *McDaniels v. Flick*, 59 F.3d 446, 454 (3d Cir. 1995); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1135 (3d Cir. 1992).

The payments at issue here were not wages because, as in *North Dakota*, they were given in exchange for the relinquishment of property rights in tenure that were established at the beginning of the tenure relationship between the faculty members and the University.

## II.

As some courts and commentators have observed,[16] defining tenure can be a vexing task. But the University's Faculty Policies, which appear in the record here, provide guidance. The concept of tenure that emerges from the record more closely resembles a right established at the onset of a new relationship than the types of benefits at-will employees earn over time. I would hold payments for relinquishment of the latter type of rights are wages, but those for the former type are not.

Two core aspects of the University's tenure policy distinguish the tenure right from certain job benefits earned over time that may be viewed as remuneration for employment.

## A.

First, as in *North Dakota*, the process by which tenure is awarded at the University here distinguishes tenure from rights earned through service during the employment relationship.

The University's "tenure stream" is composed of faculty who are eligible to receive tenure and those who already have tenure. The tenure stream includes instructors, assistant professors, associate professors, and professors. Only associate professors and professors can have tenure. A faculty member without tenure can serve only for a limited time in the tenure

---

[16] *See, e.g., North Dakota State Univ. v. United States*, 84 F. Supp. 2d 1043, 1050 (D.N.D. 1999), *aff'd*, 255 F.3d 599 (8th Cir. 2001); Ralph S. Brown & Jordan E. Kurland, *Academic Tenure and Academic Freedom*, 53 Law & Contemp. Probs. 325, 325 (1990).

stream – usually seven years. At the end of that period, either the faculty member receives tenure or his or her service in the tenure stream is terminated. But this "probationary" period is a prerequisite to tenure and is not analogous to the time period during which employees accrue different types of seniority rights. The University's policies show tenure is more than a recognition of satisfactory work. Rather, the decision to grant or deny tenure depends on myriad qualitative factors and calls for an evaluation of each candidate's capacity for research, teaching, and contributing to knowledge. Moreover, the University's policy specifically imposes certain "Non-Merit Considerations," such as financial resources, personnel needs,[17] and curriculum demands.[18] These latter criteria may depend not on the individual professor's role at the University, but on extrinsic forces. Accordingly, the grant or denial of tenure cannot be viewed strictly as an evaluation of whether a professor has performed adequately during employment, as is the case with the accrual of seniority rights in other circumstances.

As the majority observes, the Sixth Circuit, in *Appoloni v. United States*, 450 F.3d 185, 185 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 1123 (2007), held early retirement payments to retired public school teachers given in exchange for the teachers' statutory tenure rights were FICA wages. But I believe the tenure right at issue in *Appoloni* is distinguishable from the university tenure here and in *North Dakota*.

In *Appoloni*, the public school teachers obtained tenure *automatically* upon completion of a probationary period. *Id.* at 194. But here, just as in *North Dakota*, tenure is "much more than a recognition for past services," 255 F.3d at 605, and "is not automatic upon completing service for a specified time period, which is a hallmark of ordinary seniority rights." *Id.* In cases like *Appoloni*, the teacher's past satisfactory work during the probationary period may be seen as consideration for the tenure award, but not so here where the tenure decision is marked by such broad discretion and "Non-Merit

---

[17] For example, the tenure policy states that in order to "retain flexibility within the anticipated resources of the University, the proportion of tenured to non-tenured faculty must not rise to a level that would impair the University's or school's capacity to respond to changing demands for its services."

[18] Relevant factors include "the current standards of the relevant discipline or profession at large and the requirements of the candidate's department or school at the time of the recommendation and for the then-foreseeable future."

Considerations." *See id.* at 606 (rejecting "the government's underlying premise that tenure accrues over time and is similar to seniority").

**B.**

Second, the rights of tenure, along with its purposes, show that it marks a new relationship between professor and university.

It is undisputed here that tenured faculty at the University can be terminated only for "cause" or "financial exigency," and only after a hearing. According to the University, tenure, once awarded, is "obligatory for the University, optional with the faculty member." As we have recognized, tenure at a public university is a right in "property" that entitles its holder to procedural due process. *San Filippo*, 961 F.2d at 1135. The right to indefinite employment absent cause or financial exigency may carry substantial economic value even though it is not the type of property that typically is traded. *See Vail v. Bd. of Educ. of Paris Union Sch. Dist. No. 95*, 706 F.2d 1435, 1451 (7th Cir. 1983) (Posner, J., dissenting) ("A contract that gives a teacher the right to be employed till he retires is special, for unless he is old or rich the present value of his tenure right is probably his biggest asset."), *aff'd by an equally divided court*, 466 U.S. 377 (1984) . By relinquishing tenure, the faculty members gave up this value.

Tenure serves several purposes. It gives the University "continuity in its experienced faculty and in the functions for which they are responsible." It helps the University foster "the independence of the mind and the freedom to inquire." It "constitutes recognition by the University that a [tenured faculty member] is qualified by achievements and contributions to knowledge as to be ranked among the most worthy of the members of the faculty engaged in scholarly endeavors: research, teaching, professional training, or creative intellectual activities of other kinds." And importantly, as the University notes, tenure serves an instrumental purpose in granting prospective rights that protect faculty members' academic freedom.

For all of these reasons, I agree with the *North Dakota* court's characterization of tenure as establishing a different relationship with the University, not a mere continuation of service with added benefits. 255 F.3d at 606. Tenure is the second of "two successive relationships with the university," *id.*, and is "a significantly different status – effectively a new job." *Id.* (quoting *Mayberry v. Dees*, 663 F.2d 502, 516 (4th Cir. 1981)). As in *North Dakota*, the property rights faculty members relinquished here were not accrued through duration of satisfactory employment, but were instead granted at the beginning of the separate tenured relationship with the University, a beginning marked by the recognition of superior achievement and "Non-Merit Considerations." The payments are more analogous to buy-outs of unexpired contract rights than to severance payments or payments for

23

the relinquishment of rights of at-will employees.  Accordingly, I would hold payments for the relinquishment of the property right in tenure at the University were not remuneration for employment and were not subject to FICA taxation.

### III.

For the foregoing reasons, I would affirm the judgment of the District Court.