

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-11-2008

# Bus Edge Grp v. Champion Mtg

Precedential or Non-Precedential: Precedential

Docket No. 07-1059

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Bus Edge Grp v. Champion Mtg" (2008). *2008 Decisions*. Paper 1349.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1349

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

<u>PRECEDENTIAL</u>

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 07-1059

———


THE BUSINESS EDGE GROUP, INC.,

<u>Appellant</u>,

v.

CHAMPION MORTGAGE COMPANY, INC.,


———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 03-cv-5498)
District Judge: Honorable Susan D. Wigenton

———

Argued January 3, 2008

Before: FUENTES, JORDAN, <u>Circuit Judges</u>, and DUBOIS,[*]
<u>District Judge</u>.


(Filed March 11, 2008)

Steven F. Gooby (Argued)

———

* Honorable Jan E. DuBois, Senior District Judge for the
United States District Court of the Eastern District of Pennsylvania,
sitting by designation.

DLA Piper
Two Tower Center Boulevard
Suite 1600
East Brunswick, New Jersey 08816

    Attorneys for Appellant

Thomas J. Burns (Argued)
Reed Smith
136 Main Street
Suite 250, Princeton Forrestal Village
Princeton, New Jersey 08540

    Attorneys for Appellees

————

## OPINION OF THE COURT

————

FUENTES, Circuit Judge.

    This case involves a company, The Business Edge Group, Inc. ("Business Edge"), which targeted and subscribed to a vanity toll free telephone number in order to take advantage of the value it presented to Champion Mortgage Company, Inc. ("Champion").[1] The issue we address is whether Business Edge's actions violated an FCC regulation which prohibits entities from acquiring toll free telephone numbers in order to sell them and from hoarding toll free telephone numbers. For the reasons that follow, we conclude that Business Edge did not sell the telephone number at issue to Champion and that the case must be remanded for a determination of whether Business Edge engaged in hoarding.

I.

---

[1] A vanity telephone number is a number that spells a word or phrase on a telephone number pad.

At some point prior to 1998, Business Edge acquired the toll free telephone number 1-800-242-6740 (1-800-Champi0[n], or "the Number").[2] Sheldon Kass, the President of Business Edge, testified during a deposition that he acquired the Number because "it had certain spellings" associated with it, namely, "the word champion," and thus the Number had potential application in the mortgage business. (App. 98.) After subscribing to the Number, Business Edge routed all calls to the Number to an unnamed mortgage company. It then contacted Champion to inform them that it had an 800 number that spelled "Champi0n" and that when people misdialed Champion's toll free telephone number, using a "zero" rather than the letter "o," they were being routed to another mortgage company. When Cindy Stancavish, a marketing manager at Champion, called the Number to validate Business Edge's claim, she found that the mortgage company did not identify itself, leading callers to believe they were speaking with Champion.

Because of the perceived loss of business, Champion offered to purchase the number from Business Edge for $60,000, but Business Edge rejected the offer. The parties then entered into an agreement (the "1998 Agreement") pursuant to which Business Edge would route calls to the Number to Champion for $.10 per minute, plus $3.00 per each customer with an unique telephone number that called the Number.[3] The purpose of the 1998 Agreement was to set up a trial period to show Champion the volume of traffic to the Number so it could determine whether to enter into a longer-term agreement with Business Edge. During the pendency of the 1998 Agreement, Business Edge consulted Gelt Financial, a local mortgage lender and servicing company, to get a valuation of the routing arrangement from Champion's

---

[2] In contrast, Champion's telephone number is 1-800-242-6746, or 1-800-Champio[n]. Thus, the difference between the two telephone numbers is whether you dial the "o" in Champion as a zero or the letter "o," which corresponds to a "6" on a telephone number pad.

[3] The parties appear to dispute whether the offer to buy the Number occurred before or after entering the 1998 Agreement. This dispute has no impact on the analysis.

perspective. Following Gelt's report, Business Edge and Champion agreed to an arrangement in which Champion would pay $25,000 per month for five years in exchange for Business Edge routing calls made to the Number to Champion (the "1999 Agreement").

The parties performed on the 1999 Agreement from August 1999 through December 2002. The following month, Champion sent Business Edge a letter stating that the contract violated an FCC regulation, 47 C.F.R. § 52.107, and demanded reimbursement for the payments that had been made on the contract. Despite the letter, Champion continued to pay on the 1999 Agreement through April 2003. Champion failed to pay the final $375,000 remaining on the 1999 Agreement and Business Edge terminated the contract and its routing services.

Business Edge filed a complaint in state court, claiming breach of contract for Champion's failure to pay the final $375,000 in monthly fees. Champion removed the case to federal court on diversity grounds. In the District Court, Champion argued that the case should be transferred to the FCC under the doctrine of primary jurisdiction because resolution of the case requires interpretation of FCC rules and policies, or, in the alternative, that the District Court should determine that the 1999 Agreement was void *ab initio* because Business Edge violated 47 C.F.R. § 52.107 by brokering the Number to Champion. In contrast, Business Edge contended that there was no technical sale of the Number, so there could be no violation of 47 C.F.R. § 52.107. The District Court determined on the eve of trial that no material issues of fact were in dispute and the case could be disposed of as a matter of law.

The District Court first decided that it was unnecessary to transfer the case to the FCC under the doctrine of primary jurisdiction. The District Court found that it was just as well suited as the FCC to determine the principal issue in the case, whether the contract violated 47 C.F.R. § 52.107, which provides that "[t]oll free subscribers shall not hoard toll free numbers" and that "[n]o person or entity shall acquire a toll free number for the purpose of selling the toll free number to another entity or to a person for a

4

fee."[4]  (App. 12-16.)

The court then focused on whether Business Edge acquired the number in order to sell it to Champion and found that because the value of the 1999 Agreement was in line with the value that Champion would receive for the calls, rather than being in line with the cost of routing services, the 1999 Agreement should be re-characterized as a sale of the Number.  Thus, the District Court held that the 1999 Agreement violated 47 C.F.R. § 52.107.  Finding that both parties had unclean hands in creating the 1999 Agreement, the court excused Champion from further payments under the contract and denied restitution of the payments previously made.  Business Edge appeals the District Court's order.[5]

---

[4] The regulation reads, in pertinent part, as follows:

(a) As used in this section, hoarding is the acquisition by a toll free subscriber from a Responsible Organization of more toll free numbers than the toll free subscriber intends to use for the provision of toll free service. The definition of hoarding also includes number brokering, which is the selling of a toll free number by a private entity for a fee.

> (1) Toll free subscribers shall not hoard toll free numbers.
> (2) No person or entity shall acquire a toll free number for the purpose of selling the toll free number to another entity or to a person for a fee.

47 C.F.R. § 52.107(a).

[5] The District Court had jurisdiction over the case pursuant to 28 U.S.C. § 1332.  The District Court's December 11, 2006 summary judgment order disposed of all claims of all parties.  Accordingly, jurisdiction is proper in this court pursuant to 28 U.S.C. § 1291.  We exercise plenary review over a district court's summary judgment ruling.  Univ. of Pittsburgh v. United States,

II.

### A. The Regulation

Section 52.107(a) provides that "(1) [t]oll free subscribers shall not hoard toll free numbers" and that "(2) [n]o person or entity shall acquire a toll free number for the purpose of selling the toll free number to another entity or to a person for a fee." Hoarding is defined as "the acquisition of more toll free numbers than one intends to use for the provision of toll free service, as well as the sale of a toll free number by a private entity for a fee." 47 C.F.R. § 52.107(b). Number brokering, which is included in the definition of hoarding, is defined as "the selling of a toll free number by a private entity for a fee." 47 C.F.R. § 52.107(a).

### B. Primary Jurisdiction

We will first review the District Court's decision not to transfer this case to the FCC under the doctrine of primary jurisdiction. The parties did not raise this issue on appeal. However, we can review, *sua sponte*, whether it is appropriate to transfer the case to the FCC under the doctrine of primary jurisdiction. See MCI Telecomms. Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1103 (3d Cir. 1995).

Primary jurisdiction "requires a court to transfer an issue within a case that involves expert administrative discretion to the federal administrative agency charged with exercising that discretion for initial decision." Richman Bros. Records, Inc. v. U.S. Sprint Commc'ns Co., 953 F.2d 1431, 1435 n.3 (3d Cir. 1991) (citations omitted). According to Richman, "[t]he doctrine has been applied . . . when an action otherwise within the jurisdiction of the court raises a question . . . involv[ing] technical questions of fact uniquely within the expertise and experience of an agency – such as matters turning on an assessment of industry conditions." Id.

---

507 F.3d 165, 166 n.1 (3d Cir. 2007).

6

While this case presents "technical questions of fact" that are "within the expertise" of the FCC, we believe it more appropriate to remand to the District Court for further proceedings than to transfer it to the agency because we find that the meaning of the regulation can be determined from its text. See Advance United Expressways, Inc. v. Eastman Kodak Co., 965 F.2d 1347, 1353 (5th Cir. 1992) (holding that a court need not refer a case under the doctrine of primary jurisdiction if "it can resolve the issues before it, using the plain language of the [regulations] and the ordinary rules of construction"); cf. Distrigas of Massachusetts Corp. v. Boston Gas Co., 693 F.2d 1113, 1118 (1st Cir. 1982) (referring case under doctrine of primary jurisdiction because "the meaning of the disputed language . . . cannot be determined solely from the text itself, nor even by reference to the intent of the parties").

### C.     Defining Sale

The District Court concluded that the 1999 Agreement was a contract for the sale of the Number and thus violated 47 C.F.R. § 52.107. We disagree. First, we note that subscribers do not "own" toll free telephone numbers. In the Matter of Toll Free Service Access Codes, 20 F.C.C.R. 15089, 15090 ¶ 4, 2005 WL 2138620, at *2 (F.C.C. Sept. 2, 2005) ("Telephone numbers are a public resource and neither carriers nor subscribers 'own' their telephone numbers."). Because subscribers do not own their telephone numbers, they can never "sell" them outright. Instead, they "sell" the interest that they have in the number; that is, the right to use it to provide toll free service. In order to determine whether the 1999 Agreement constituted a sale for the purposes of 47 C.F.R. § 52.107, we review dictionary definitions of "sale" and "sell" to assess whether the agreement falls within the definitions. Black's Law Dictionary (8th ed. 2004) ("Black's") defines "sale" as "[t]he transfer of property or title for a price," id. at 1364, and defines "sell" as "[t]o transfer (property) by sale," id. at 1391. Black's defines "transfer" as "[a]ny mode of disposing of or parting with an asset or an interest in an asset." Id. at 1535. Meanwhile, Merriam-Webster's Online Dictionary defines "sale" as "the act of selling; specifically: the transfer of ownership of and title to property from one person to another for a price" and, in

relevant part, defines "sell" as "to give up (property) to another for something of value (as money)." Id. at http://www.merriam-websters.com (last visited Feb. 12, 2008). Next, Random House Webster's Unabridged Dictionary ("Webster's") defines "sale," in relevant part, as a "transfer of property for money or credit," id. at 1693, and "sell," in relevant part, as "to transfer (goods) to or render (services) for another in exchange for money; dispose of to a purchaser for a price," id. at 1739. Webster's defines "dispose of," in relevant part, as "to transfer or give away, as by gift or sale." Id. at 568.

Without exception, these definitions of "sale" and "sell" emphasize the transfer of property or ownership for a price and the finality of the transaction. Here, the fundamental features of the 1999 Agreement were that Business Edge retained control of the Number, preserving responsibility for paying toll charges, and that Business Edge would only perform routing services for a period of five years. We, therefore, cannot conclude that the 1999 Agreement was a sale. Therefore, we vacate the District Court's decision that the 1999 Agreement should be invalidated for violating the prohibition on selling toll free telephone numbers in 47 C.F.R. § 52.107.

D.      Brokering

At oral argument, the appellees focused their efforts on convincing us that even if we do not find that the 1999 Agreement constituted a sale, we should find that it constituted impermissible number brokering. See 47 C.F.R. 52.107(a)(1). We find no support for this notion. Again and again the FCC has defined number brokering as the sale of a number. In the regulation itself, number brokering is defined as "the selling of a toll free number by a private entity for a fee." 47 C.F.R. 52.107(a). The FCC repeated the regulatory language in the December 21, 2007 decision, indicating that "[s]ection 52.107(a)(2) of the Commission's rules prohibits 'brokering,' which is the selling of a toll-free number by a private entity for a fee." In the Matter of Toll-Free Service Access Codes, 2007 WL 4481492, at *1. Ten years earlier, the FCC indicated that "[b]rokering is the buying or selling of numbers." In the Matter of Toll Free Service Access Codes,

8

Second Report and Order and Further Notice of Proposed Rulemaking, 12 F.C.C.R. 11162, 11164-65 ¶ 2 n.10 (F.C.C. 1997). Accordingly, we find no basis to conclude that number brokering is broader than selling toll free telephone numbers.

### E.  Hoarding

Finally, we consider whether the 1999 Agreement should be invalidated because Business Edge improperly hoarded toll free telephone numbers.  Regulation 47 C.F.R. 52.107 defines "hoarding," as "the acquisition of more toll free numbers than one intends to use for the provision of toll free service, as well as the sale of a toll free number by a private entity for a fee."  47 C.F.R. § 52.107(b).  As discussed above, we cannot conclude that Business Edge sold the Number to Champion.  However, it is possible that Business Edge acquired more numbers than it intended to use for the provision of toll free service in violation of the prohibition on hoarding.  In In the Matter of Toll Free Service Access Codes, Second Report and Order and Further Notice of Proposed Rulemaking, 12 F.C.C.R. at 11189 ¶ 38, the FCC discussed the purpose of regulating the hoarding and brokering of toll free numbers:

> Hoarding occurs when a toll free subscriber acquires more numbers from a [telephone company] than it intends to use for the provision of toll free service. If a subscriber refuses to release numbers that are not in use, the pool of available numbers decreases. This will exacerbate toll free number depletion and necessitate the opening of an additional toll free relief code earlier than would be necessary otherwise. It is time consuming and costly for the industry to perform the necessary modifications to the network so that it can support calls using the new code. Hoarding can also result in some customers being unable to obtain toll free numbers, even though certain numbers are not being used.

After defining the concept of hoarding, the FCC stated

why number hoarding and number brokering is against the public interest:

> Brokering provides motivation for hoarding and therefore results in quicker exhaustion of the current [supply of numbers] and interferes with the orderly allocation of numbering resources. Simply prohibiting a subscriber from hoarding a number will not fully eliminate the effects of hoarding. For example, a subscriber could acquire a group of numbers it expected to sell at a later date. The subscriber could then nominally place the numbers in service through "dummy" affiliates or other entities that otherwise would not employ a toll free number.

Id. Given the record before us, we believe Business Edge clearly violated the spirit of 47 C.F.R. § 52.107 as it did not intend to use the Number for its own customers; Sheldon Kass testified that he acquired the Number because it spelled "the word champion," and therefore could be marketed to a company in the mortgage business. (App. 98.) However, we cannot determine, in the first instance, whether Business Edge violated 47 C.F.R. § 52.107(a)(1).[6] Hoarding requires subscribing to more telephone numbers than the entity intends to use for the provision of toll free service and the record before us is inadequate to make that determination. Accordingly, we will remand the case to the District Court for further proceedings

---

[6] We are mindful that, given the way section 52.107 is currently drafted, an entity such as Business Edge can avoid running afoul of the regulation by simply refusing to "sell" a toll free telephone number outright, and to instead offer a lease for the number, as Business Edge apparently did here. It strikes us that the goal of prohibiting the sale of toll free telephone numbers – eliminating the motivation for hoarding and the resultant accelerated exhaustion of the number supply – is equally served by prohibiting toll free telephone number leasing. This represents a clear loophole in the regulation that the FCC may wish to address.

consistent with this decision.