**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____
_____

No. 08-4425
_____

MELROSE, INC.,
<u>Appellant</u>

v.

CITY OF PITTSBURGH; CITY OF PITTSBURGH
ZONING BOARD OF ADJUSTMENT;
CLIFFORD B. LEVINE, ESQ.;
REGIS D. MURRIN, ESQ.; JESSE W. FIFE, JR.,

_____

On Appeal from the District Court for the
Western District of Pennsylvania
(No. 02-cv-01161)
District Judge: Joy Flowers Conti

Argued January 25, 2010

Before: FUENTES and FISHER, <u>Circuit Judges</u>, and
DIAMOND,[*] <u>District Judge</u>.

(Opinion Filed: July 20, 2010)

Howard R. Lehman, Esq.  (Argued)
6576 Rosemoor St.
Pittsburgh, PA 15217

<u>Counsel for Appellant</u>

Lawrence H. Baumiller, Esq.  (Argued)
George R. Specter, Esq.
City of Pittsburgh Department of Law
313 City-County Building
414 Grant Street
Pittsburgh, PA 15219

<u>Counsel for Appellees</u>

—————————

OPINION OF THE COURT

—————————

---

[*] Honorable Paul S. Diamond, United States District
Judge for the Eastern District of Pennsylvania, sitting by
designation.

2

FUENTES, Circuit Judge:

Melrose, Inc. ("Melrose") brought this action challenging the Pittsburgh Zoning Board's rejection of its applications to change the Identification Signs on five Pittsburgh buildings. The proposed building names included "wehirenurses.com building" and "palegalhelp.com." The Zoning Board determined that the signs were Advertising Signs and were therefore prohibited in the zoning districts where Melrose's buildings were located. In reaching this decision, the Zoning Board applied four criteria that it had articulated in a prior decision for determining whether a sign with advertising aspects could still be classified as a genuine Identification Sign. Melrose challenged this decision in the District Court, arguing that the Zoning Board's rejection of its sign applications violated its First Amendment free speech and Fourteenth Amendment equal protection rights. The District Court rejected Melrose's claims, applying *Central Hudson Gas & Electric Corp. v. Public Commission of New York*, 447 U.S. 557 (1980), which provides the standard for assessing restrictions on commercial speech.

In our view, Melrose's First Amendment claim is not controlled by *Central Hudson*, but instead should be evaluated under the test we delineated in *Rappa v. New Castle County*, 18 F.3d 1043 (3d Cir. 1994). Applying *Rappa*, we hold that the Zoning Board's application of the criteria constituted a permissible "context-sensitive" analysis. We also conclude that Melrose's equal protection claims must fail as Melrose is simply not similarly situated to the entities that it claims were treated differently. Accordingly, we affirm the District Court's grant of summary judgment.

3

**I.**

Between May 1998 and February 1999, Melrose, a Pennsylvania corporation, executed lease agreements with the owners of five Pittsburgh buildings. Each lease granted Melrose the right to name the building and to construct and display signs on the building with that name, as well as the right to sublease or assign these naming rights. The leases, which varied in length from six to twenty-seven years, did not limit the number of times that Melrose could change a building's name.[1]

Starting in February 1999, Melrose filed applications with the city's zoning administrator to erect building identification signs on the five properties. The process went smoothly and the requested names were approved. The building at 840 East Ohio Street was named "Ram Staiger," a combination of the building owner's name and a business on the premises.[2] The nearby building at 818 East Ohio Street was named "Caskey Limited," after the girlfriend of one of Melrose's officers. A building at 1217 West Carson Street was named the "Three Rivers Building," and one at 57 Bates Street was named "The Cole Building," after the son of a Melrose

---

[1] The first lease granted Melrose naming rights to 840 East Ohio Street for approximately fifteen years, from May 27, 1998 to June 30, 2013. The second lease, for 1025-1033 Beaver Avenue, was entered on July 8, 1998 and granted naming rights for seventy-two months. The third lease, executed on February 9, 1999, covered a fifteen-year term for the building at 818 East Ohio Street. An eighteen-year lease for naming rights was signed for the building at 1217 West Carson Street. The fifth lease was twenty-seven years in duration and applied to the building at 57 Bates Street.

[2] A second application for this building was later accepted, which changed the name to simply "Staiger."

officer. The fifth building, at 1025-33 Beaver Avenue, was named "SSSP."[3]

In March 2001, Melrose submitted applications to rename each of the five buildings and change their signage. The Cole Building was to be renamed the "wehirenurses.com building." The application included a drawing of one proposed sign, twenty-five feet wide and twenty feet high, with "wehirenurses.com" repeated on four separate lines and the word "building" below that on a fifth line. The SSSP and Caskey Limited buildings were both to be renamed "palegalhelp.com." The Ram Staiger building's name was to be changed to "Baruch Atah Hashem," a Hebrew expression that means "Blessed be God." A signage application was also submitted for the Three Rivers Building, but it did not specify the new name. At a hearing before the Zoning Board, however, the president of Melrose testified that he intended to change the name of this building to "www.palegalhelp.com." Melrose did not propose any changes to the location, size, or shape of the signs already in place on the buildings, but instead sought to change only the signs' content.

The Pittsburgh Zoning Code ("Zoning Code") distinguishes between three categories of signs. These definitions are important as Melrose sought to have its signs, with the proposed new names, remain classified as "Identification Signs." "Identification Signs" are permitted in certain zones that prohibit "Advertising Signs." Pittsburgh Code of Ordinances § 919.02. Section 919.01.C of the Zoning Code, in effect at the time of Melrose's applications, provided these definitions:

> 2. **Advertising Sign** means a sign that directs attention to a business, commodity, service or entertainment, conducted, sold or offered:
>
> (a) Only elsewhere than upon the premises where the sign is displayed; or

---

[3] According to the December 14, 2001 Zoning Board of Adjustment ("Zoning Board") decision on the renaming of this building, there is no evidence of an application to designate this property "SSSP."

(b) As a minor and incidental activity upon the premises where the sign is displayed.

3. **Business Sign** means a sign that directs attention to a business, organization, profession or industry located upon the premises where the sign is displayed; to the type of products sold, manufactured or assembled; and/or to the service or entertainment offered on such premises; except a sign pertaining to the preceding if such activity is only minor and incidental to the principal use of the premises.

4. **Identification Sign** means a sign used to identify the name of the individual or organization occupying the premises; the profession of the occupant; the name of the building on which the sign is displayed; or the name of the major enterprise or principal product or service on the premises.

(J.A. at 120.) In addition to only being permitted in certain zoning districts, "Advertising Signs" are subject, under § 919.02, to more rigorous regulations, with respect to location, placement, size, shape, and illumination, than non-advertising signs. These restrictions further the purposes of the Code's sign regulations, which include allowing advertising signs only in locations that "neither lessen the visual attributes of the City through the placement of such signs, nor cause confusion, safety problems or lessen the ability to identify local businesses through visual clutter." Pittsburgh Code of Ordinances § 919.01.A.11.

Finding that the proposed signs' content represented advertising, the Zoning Administrator denied all of Melrose's applications. The five buildings were in zoning districts where the Zoning Code generally prohibited Advertising Signs, but allowed Business Signs and Identification Signs. Melrose appealed these decisions to the Zoning Board, which conducted consolidated hearings. It denied all five appeals in separate decisions.

6

The Zoning Board found that the proposed signs for the buildings to be named "palegalhelp.com" and "wehirenurses.com building" represented "a plan or strategy of evasion," which sought to avoid the Zoning Code's restrictions on Advertising Signs. (J.A. at 70.) As for the building to be named "Baruch Atah Ashem," which Melrose described as a "religious message," the Zoning Board found that this name did not fit within the Zoning Code's definition for an Identification Sign. (*Id*. at 62.) The City of Pittsburgh had sent the Zoning Board a letter advising that there was no legal basis for denying this application on the grounds that it had no advertising component and was a valid building name. Without addressing the City's position, the Zoning Board denied the application but invited Melrose to brief the possible constitutional implications of this particular decision. Melrose did not, however, pursue the matter further at the Zoning Board level. As for the fifth building, which Melrose did not provide a new name for in its application, the Zoning Board found that the Zoning Administrator should not have made a decision until the application was completed. It remanded to the Zoning Administrator so that Melrose could submit an amended application, but a new application was never submitted.

One month before its decisions on Melrose's appeals, the Zoning Board had approved signs for Heinz Field, a major football stadium that is home to the National Football League's Pittsburgh Steelers and the University of Pittsburgh's football team. The H.J. Heinz Company ("Heinz") had entered into a sponsorship agreement with the Steelers and had spent $57 million to obtain the naming rights to the Stadium for a period of twenty years. Neighborhood organizations challenged the proposed signage at Heinz Field, arguing that the signs were Advertising Signs rather than Identification Signs and therefore prohibited. In an interim decision in the case, issued on August 15, 2001, the Zoning Board acknowledged that certain Identification Signs, which mention the name of a company or product, may also have an advertising aspect. Accordingly, it identified four attributes that an Identification Sign with an advertising component must possess to avoid being categorized as an Advertising Sign. The four criteria included: first, one of the sign's major purposes is to establish a destination point

7

generally recognized by the public at a specific location; second, the established location is important to a material segment of the public (for example, a sports, cultural, commercial or artistic venue); third, "there must be evidence of intended longevity of the sign adequate to sustain the designation point concept"; and fourth, either the owner of the facility or its principal user should be in control of the destiny of the sign, rather than a third party. (Pl.'s Mot. for. Summ. J. App. at 295-96 [Pittsburgh Zoning Board of Adjustment, Interim Decision in Zone Case 85 of 2001 (Aug. 15, 2001)].) These criteria were subsequently cited in the decisions rejecting Melrose's applications, although in a slightly different formulation. In its decision applying these criteria and approving the Heinz Field signage, the Board recognized the advertising component of naming rights but emphasized that the Steelers' lengthy lease agreement for the stadium and the lengthy sponsorship agreement reached with Heinz reflected a "long-term commitment that the Stadium will be known to the general public as 'Heinz Field.'" (Supp. App. at 10.) It concluded that the naming was not a "subterfuge to circumvent the Code's limitations on advertising" but instead a legitimate attempt to name the stadium, albeit with a natural consequence of advertising and marketing benefits for Heinz. (*Id.*)

In its subsequent decisions rejecting Melrose's applications, the Zoning Board offered a slightly different articulation of the attributes that it would consider necessary for "a purported 'Identification Sign' . . . to avoid being categorized as an Advertising Sign." (J.A. at 56.) These included that:

> One of its major purposes of, or result of, an identification sign must be to establish a specific destination point that will be generally recognized by the public as being at a set geographical location. There must be evidence of intended longevity of the sign adequate to sustain the designated point concept. It cannot be as transitory as a commercial billboard. However, it need not be immune from unexpected, unforeseen or unwelcome circumstances that might result in a termination. Either the owner of the facility or a principal long term space user thereof should be

8

in control of the destiny of any such sign, rather than having control turned over to some third party, to assure continuing compliance with the necessary attributes.

*Id.*

In applying these criteria to Melrose's applications, the Board expressed particular concern with the longevity requirement and with the transfer of building identification rights, which it noted may lead to frequent changes for commercial purposes. Frequent changes in the content of signs and a lack of longevity were deemed inconsistent with the purposes of building Identification Signs – directing the public towards a specific geographical location. The Zoning Board distinguished Melrose's failure to provide evidence of an intention to keep the building names for a substantial period of time from the twenty-year agreement entered into by the Steelers and Heinz. It also noted in its decisions that Melrose's representative had testified that the purpose of the signs was to direct individuals to the website business in order to make a profit.

Melrose filed this action in the Western District of Pennsylvania, alleging that Defendants – the City of Pittsburgh, the Pittsburgh Zoning Board, and the three individual members of the Zoning Board – violated its First and Fourteenth Amendment rights by arbitrarily denying its sign applications. Melrose asserted two claims pursuant to Section 1983: first, that Defendants deprived it of its First Amendment free speech rights when they impermissibly limited the content of its signs; and second, that Defendants deprived it of its Fourteenth Amendment equal protection rights by treating similarly situated entities more favorably. Melrose also brought a third claim pursuant to the equal protection clause of the Pennsylvania Constitution.

The case was referred to a Magistrate Judge for pretrial proceedings. The Magistrate Judge issued a Report and Recommendation regarding Defendants' motion for summary judgment and Melrose's motion for partial summary judgment, recommending that the District Court grant Defendants' summary judgment motion and deny Melrose's motion. The

9

Magistrate Judge evaluated Melrose's First Amendment claims in light of *Central Hudson Gas & Electric Corp. v. Public Commission of New York*, 447 U.S. 557 (1980), which sets forth a framework for assessing restrictions on commercial speech. Under this four-part analysis, the court

> must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566. The Magistrate Judge found the proposed speech to be misleading, but nonetheless proceeded to examine the remaining factors. The Magistrate Judge concluded that the city had a substantial interest in restricting the placement of advertising signs, that the denial of Melrose's signs substantially advanced this interest, and that the regulation was not overly restrictive. The Magistrate Judge also rejected Melrose's equal protection claims, finding that since the regulations passed muster under *Central Hudson*'s commercial speech test, they necessarily survived equal protection analysis.

Melrose filed objections and the District Court conducted a de novo review of the record. The District Court adopted the Report and Recommendation in part and rejected it in part, ultimately granting Defendants' motion for summary judgment. The Court, applying *Central Hudson*, rejected the Magistrate Judge's finding that the proposed building names were misleading. Nonetheless, it ultimately adopted the Report and Recommendation's conclusion that the regulations constituted valid restrictions on commercial speech and did not violate Melrose's First Amendment rights. The Court held that the application related to the building Melrose intended to name "Baruch Atah Hashem" was not properly before it because Melrose had failed to reapply and brief the possible

constitutional claim related to that application. Melrose does not raise this issue on appeal. The District Court rejected Melrose's argument that the term "Building Identification Sign" is unconstitutionally vague, either on its face or as applied. Finally, the Court rejected three additional objections to the Report and Recommendation and found that, even if summary judgment was not appropriate, the individual Defendants were entitled to immunity. Melrose filed a timely notice of appeal.

## II.

The District Court exercised jurisdiction over Melrose's claims under 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's summary judgment ruling. *Bus. Edge Group, Inc. v. Champion Mortgage Co., Inc.*, 519 F.3d 150, 153 n.5 (3d Cir. 2008). We apply the same standard as the District Court: "Summary judgment is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007) (internal quotation marks and citation omitted). In a case such as this, which involves First Amendment issues, an appellate court must "make an independent examination of the whole record." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (internal quotation marks and citation omitted).

## III.

As Melrose clarified at oral argument, its challenge focuses on the Zoning Board's method of applying the sign ordinances and determining whether a purported Identification Sign, which has an advertising aspect, can still properly be classified as an Identification Sign. The District Court's decision analysed Melrose's claims by applying the framework articulated in *Central Hudson*. While we agree with the District Court's conclusion – that the Zoning Board's decisions rejecting Melrose's sign applications did not violate Melrose's First and Fourteenth Amendment rights – we hold that the proper framework for evaluating these claims is governed by our

11

decision in *Rappa v. New Castle County*, 18 F.3d 1043 (3d Cir. 1994).[4]

### A.  Melrose's First Amendment Claim

In *Rappa*, we articulated a framework for determining whether a statute is content-based or content-neutral. This determination is the first step in a First Amendment analysis, as the answer dictates the standard that we apply in reviewing the ordinance at issue. *Rappa*, 18 F.3d at 1053 (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 99 (1972)); *see also Riel v. City of Bradford*, 485 F.3d 736, 743 (3d Cir. 2007). If the statute is content-based, the government must "show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Rappa*, 18 F.3d at 1053 (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)) (internal quotation marks omitted). If instead the statute is found to be content-neutral in that it "merely restricts the total quantity of speech by regulating the time, the place or the manner in which one can speak, a very different test applies." *Id.* (citations omitted). Under this test, the government is permitted to "impose reasonable restrictions on the time, place, or manner of protected speech, provided [1] the restrictions 'are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and [3] that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)) (further citation omitted).

---

[4] *Central Hudson*, which the District Court applied in evaluating Melrose's claims, provides the framework for evaluating restrictions on commercial speech, particularly restrictions that distinguish between commercial and non-commercial speech based on content. That is not the situation here. As we discuss more fully *infra*, we find that the Zoning Board's determination was not content-based, but instead constituted a context-sensitive analysis that sought to determine whether there was a significant relationship between the content of the signs and their specific location, such that they could truly be deemed Identification Signs.

Melrose contends that the Zoning Code was applied to its applications in a content-based manner and that no showing was made of a compelling state interest. In response, the City argues that the sign ordinance was applied in a permissible content-neutral manner. In *Riel*, a case also involving First Amendment challenges to municipal sign ordinances, we observed that "determining whether a statute is content-based or content-neutral has not been entirely straightforward." 485 F.3d at 744. *Riel* analyzed and applied the framework that we set forth in *Rappa* for making this determination.

*Rappa* likewise involved a First Amendment challenge to outdoor sign ordinances. In seeking to determine "the current state of First Amendment law pertaining to outdoor signs," we discussed at length the Supreme Court's splintered decision in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981), which dealt with a San Diego ordinance regarding billboards. *Rappa*, 18 F.3d at 1047. We found that a clear governing standard could not be derived from the plurality and concurrence in *Metromedia* and concluded that, given significant differences between the ordinances at issue in both cases, the result in *Metromedia* did not control our decision in *Rappa*. *Id.* at 1061. Instead, we articulated and then applied a "context-sensitive" analysis for determining whether a restriction on speech, including a sign ordinance, is content-neutral or content-based. We explained in *Rappa* that "[s]ome signs are more important than others" because

> they are more related to the particular location than are other signs. Allowing such "context-sensitive" signs while banning others is not discriminating in favor of the content of these signs; rather, it is accommodating the special nature of such signs so that the messages they contain have an equal chance to be communicated.

*Id.* at 1064. As an example, we noted that "[a] sign identifying a commercial establishment is more important on its premises than is a sign advertising an unrelated product." *Id.*

Determining whether a sign is related to the location where it is placed inevitably demands a consideration of the

13

sign's content. But this consideration does not by itself constitute a lack of neutrality as to specific content. Summing up our analysis, we held in *Rappa* that:

> [W]hen there is a significant relationship between the content of particular speech and a specific location or its use, the state can exempt from a general ban speech having that content so long as the state did not make the distinction in an attempt to censor certain viewpoints or to control what issues are appropriate for public debate and so long as the exception also survives the test proposed by the *Metromedia* concurrence: i.e., the state must show that the exception is substantially related to advancing an important state interest that is at least as important as the interests advanced by the underlying regulation, that the exception is no broader than necessary to advance the special goal, and that the exception is narrowly drawn so as to impinge as little as possible on the overall goal.

*Id.* at 1065 (internal footnotes omitted).[5] We outlined two ways through which the requirement that a sign be significantly related to a specific location might be satisfied. First, a sign could be particularly important to travelers on a nearby road, such as a directional sign. Second, it could be shown "that a sign better conveys its information in its particular location than it could anywhere else – for example, an address sign." *Id.* Hence, as we summarized in *Riel*, the core of *Rappa*'s holding is that exceptions such as those at issue in this case do not constitute content-based restrictions that we analyze using a

___

[5] In *Rappa*, we described the *Metromedia* concurrence's test as "essentially a more stringent version of the time, place, and manner test." 18 F.3d at 1059 n.22. Accordingly, we need not separately apply that test in situations where the *Rappa* analysis is appropriate. *See Riel*, 485 F.3d at 751 (applying the "general test for time, place, and manner restrictions," rather than *Rappa*, when "an exemption is not even arguably based on the content of the speech").

14

strict scrutiny framework. Instead, we employ "a more flexible, context-specific approach." *Riel*, 485 F.3d at 746.

Before applying the *Rappa* framework to the ordinance in this case, we first frame the issue before us. The Pittsburgh Zoning Code bans what it defines as Advertising Signs from certain areas of the city, including those in which the buildings at issue in this case are located. However, the Zoning Code permits signs classified as Identification Signs within those same zoning districts. Ordinances that exempt identification signs from a general ban on signs represent "a classic application of *Rappa*'s context-specific rule." *Id*. at 750. Such signs clearly better convey their information at the location they are intended to identify, rendering them similar to address signs. *Id*. They also promote public order by providing the public with information regarding specific buildings. *Id*. at 751.

The more complex issue in this case, however, is presented by the fact that Melrose seeks to classify its signs, which admittedly possess an advertising component, as Identification Signs. It claims that the signs do not merely advertise a web address, but in fact name the buildings they adorn. The Zoning Code, by not allowing Advertising Signs within the relevant zoning districts, creates a general ban on advertising speech in those areas. However, the four criteria that the Zoning Board has articulated and applied in the Heinz Field case and in Melrose's cases allow for an exception to this general ban when such advertising is conveyed through a sign that, although it has advertising characteristics, remains a genuine Identification Sign.

As the Zoning Board declared in its decision approving the Heinz Field signs, "[w]here a sign has components of advertising and identification, we must determine whether the purported building identification is genuine or merely an effort to utilize the location as an advertising vehicle." (Supp. App. at 11.) The four criteria articulated by the Zoning Board for making this determination provide a framework for evaluating whether a "significant relationship" exists between the content of such signs and the specific location in which they are placed. *See Rappa*, 18 F.3d at 1066. There is no indication that the City sought to "censor certain viewpoints" when it articulated and

15

applied these criteria. *Id.* at 1065. We therefore conclude that the city's four criteria satisfy the first part of the test we set forth in *Rappa*.

Accordingly, we proceed to the second portion of the *Rappa* framework. Here, we consider whether the Zoning Board's exception – for certain Identification Signs that have an advertising component, but that by satisfying the four criteria indicate that they are still a genuine Identification Sign – survives the test set forth in the *Metromedia* concurrence. Under this test we first examine whether "the exception is substantially related to advancing an important state interest that is at least as important as the interests advanced by the underlying regulation." *Id.* The City clearly has an important interest in allowing the public to identify a particular name with a geographic location, enabling the public to recognize and find these locations.[6] A sign located at the structure that it names "better conveys its information in that location than it could anywhere else." *Riel*, 485 F.3d at 750. The four criteria serve this interest by creating a narrow exception that allows for a small number of Identification Signs, which also possess advertising aspects, when there are facts that indicate that the true intent behind the sign is to identify the premises where it is located and that the name depicted will remain constant for a significant period of time. The signs at issue in this case, which also possess advertising characteristics, create a tension between the City's aesthetic interest in limiting the proliferation of Advertising Signs, which the sign regulations advance, and its interest in allowing Identification Signs. *See Metromedia*, 453 U.S. at 507-08 (identifying the "appearance of the city" as a "substantial government goal[]"). The Zoning Board's four criteria set forth a reasoned framework for resolving this tension

---

[6] To the extent that Melrose contends that this exception is specifically directed at permitting the phenomenon of naming rights at large facilities, we also recognize an important state interest in facilitating such naming agreements. As the City stated at oral argument, both the City and the public at large have an important interest in enabling the construction of such facilities, which benefit from the financial support that derives from sponsorship agreements.

16

and allow for a narrow exception to the general ban on advertising when advertising is an aspect of a sign that is genuinely intended to be an Identification Sign and therefore serves important state interests, including "public order," *Riel*, 485 F.3d at 751, and "traffic safety," *Metromedia*, 453 U.S. at 507-08.

We recognize that naming rights represent a unique phenomenon. An entity that purchases such rights seeks to benefit not simply from having signs at the location that advertise its name, but also from having the public associate its name with the venue. As one commentator has observed:

> Perhaps the single most important factor in a naming rights agreement is the understanding that the corporate sponsor's name will be used in association with the venue at all times by venue management and tenants. This use facilitates media usage in all communications and leads to recognition within the local as well as the national media. Compared with the traditional media advertising, where the broadcast of a thirty-second prime time television spot can cost $1-$2 million, it becomes apparent why naming rights are efficient marketing.

Christian Maximillian Voigt, *"What's Really in the Package of a Naming Rights Deal?" Service Mark Rights and the Naming Rights of Professional Sports Stadiums*, 11 J. Intell. Prop. L. 327, 330 (2004) (internal footnotes omitted). Hence the purchase of naming rights can prove lucrative for a sponsor for reasons beyond whether or not the sponsor is able to have signs with its name erected on the facility's exterior. The exterior signs on such facilities do not, by themselves, "name" the venue, but instead aid the public in recognizing a specific destination. As such, they "promote public order by providing information about the building[]." *Riel*, 485 F.3d at 751.

We turn to the second and third portions of the test delineated in the *Metromedia* concurrence. We find that the Zoning Board's criteria create an "exception [that] is no broader than necessary" to allow for genuine Identification Signs that possess an advertising aspect and that they are "narrowly drawn

so as to impinge as little as possible on the overall goal" of preventing the proliferation of advertising signs in certain locales. *Rappa*, 18 F.3d at 1065. The four criteria narrowly tailor this exception by requiring applicants to show that such signs are intended to establish a generally recognized destination point of interest to a significant segment of the public; that they are intended to remain in place for a significant period of time, which will both establish and sustain the public's recognition of the destination point; and that the owner or principal user of the premises, who is likely to have a vested interest in the stability of its identification, possesses control over the signs.

These criteria serve to prevent a proliferation of Advertising Signs with rapidly changing content that purport to be Identification Signs. As such they are "narrowly drawn so as to impinge as little as possible on the overall goal" of the City's sign regulations. *Id.* at 1065. The longevity criteria and the requirement that the owner or principal user of a building possesses control over the sign reinforce the City's interest in allowing the public to associate a given name with a specific location and narrowly tailor the scope of this exception. Clearly, it behooves the owner or principal user of a building, particularly one who operates a business on the premise, to ensure that signs on the building remain consistent and that they allow the public to easily ascertain and remember its location. In *Metromedia*, the Supreme Court deemed it reasonable for a city to believe that "offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising." 453 U.S. at 511 (citation omitted). Implicit in this statement is the assumption that onsite advertising, for a business at the location, will change less frequently than the contents of a commercial billboard at the same premises. Certainly a commercial tenant is not likely to move as frequently as a billboard might be changed for new advertising. Analogously, we find that the Zoning Board's concern with a building's owner or primary tenant having control over the content of signs, in conjunction with the other criteria, serves to ensure that the exception remains narrow. An owner or primary tenant would likely have more invested in ensuring that the signs that identify the premise remain stable than would a party with no interest in the premises beyond its control of the signs. In

summary, we conclude that the Zoning Board's consideration of the content of signs with an advertising aspect, for the purpose of determining whether they satisfy these criteria and can properly be classified as Identification Signs, constitutes a "context-sensitive" analysis and is not improper.

Melrose's signs clearly fail to satisfy these criteria. No showing has been made of intended longevity. In fact, Melrose asserted its right to change the content of its signs as frequently as it wished. Nor is Melrose, which controls the signs, the owner of the buildings or their primary tenant. Finally, Melrose's contention that its proposed building names would serve the public interest by identifying specific geographic locations, for purposes including the calling of emergency assistance, is undermined by the fact that it sought to name three distinct buildings "palegalhelp.com." Accordingly, we find that Melrose failed by a wide margin to satisfy the four criteria.

We also reject Melrose's contention that the criteria created an impermissibly subjective or vague standard. The Supreme Court has held that "[a] government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (internal quotation marks and citation omitted). This is true even for a facially neutral provision. *Riel*, 485 F.3d at 755. Accordingly, to avoid the danger of censorship, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth County, Ga.*, 505 U.S. at 131 (internal quotation marks and citation omitted). Permitting schemes under which decision makers are "guided only by their own ideas of public welfare, peace, safety, health, decency, good order, morals or convenience" have been rejected. *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150 (1969) (internal quotation marks omitted) (*quoted in Riel*, 485 F.3d at 755). In *Shuttlesworth*, the Court found unconstitutional a scheme that allowed the city commission to reject a parade permit if "in its judgment" any of these general concerns "require that it be refused." *Id*. at 150-51.

19

In contrast, in *Riel* we approved a permit standard that required an architectural review board to review sign and display applications "for conformity in exterior material composition, exterior structural design, external appearance and size of similar advertising or information media used in the architectural period of the district in accordance with the Resource Inventory of building architectural styles of the [city's] Historic District." *Riel*, 485 F.3d at 755 (internal quotation marks and citation omitted). We found that this standard did not afford "unbridled discretion," but instead limited the review to consideration of certain identified factors. *Id.* at 756. The ordinance at issue also established certain objective standards for material, border, and typeface. Finally, we noted that the nine-member review board "guards against applicants being subjected to the whim or caprice of one single official." *Id.* Although some room for subjective judgment remained, "the First Amendment does not require the complete absence of such judgment." *Id.*

Applying this standard to the Pittsburgh Zoning Board's four criteria – which the Zoning Board has outlined in its decisions as the framework for determining whether a sign with an advertising aspect can still be classified as an Identification Sign – we find that the criteria are not impermissibly vague or subjective. Instead, they represent "narrow, objective, and definite standards" that guide the Zoning Board's decision making. They do not leave this determination subject to a decision maker's judgment regarding expansive concepts such as "public welfare, peace, safety, health, decency, good order, morals or convenience." *Shuttlesworth*, 394 U.S. at 150. One criterion, which requires that the sign be controlled by an owner or principal user of the facility, provides an objectively verifiable standard. The other criteria are also narrow in scope, requiring an evaluation of definite factors including the intended longevity of the sign, the importance to the public of the location to be identified by the sign, and whether the sign's major purposes include the establishment of a specific destination point to be generally recognized by the public at a set location.[7] Finally, the Zoning Board, which applies these

_____

[7] Melrose specifically argues that the longevity requirement has been applied subjectively, citing other buildings

20

criteria in reviewing the Zoning Administrator's decisions, is comprised of three members, which protects against the "whim or caprice of one single official." *Riel*, 485 F.3d at 756. We conclude that the criteria articulated and applied by the Zoning Board in this case do not confer "unbridled" discretion and are neither unconstitutionally subjective nor vague.

For these reasons, Melrose's First Amendment claims fail.

### B.    Melrose's Equal Protection Claim

Melrose also raises an equal protection challenge to the application of the Zoning Code to its sign applications.[8] It contends that the Zoning Board treated its applications differently than those for new signage at Heinz Field, PNC Park, Mellon Arena, and I.C. Light Amphitheater. According to Melrose's complaint, "large, corporate, commercial entities" are allowed to name buildings in Pittsburgh "without any restrictions," while Melrose is subject to "arbitrary, capricious and irrational discrimination." (J.A. at 144.) Melrose further insinuates in its brief on appeal that this allegedly disparate

---

that have had frequent name changes. This argument is unavailing; the names at the buildings cited were changed when the building's major tenant changed. Longevity is not a general principle the Board applies to all signs, but rather a criterion it has chosen to apply in attempting to determine whether a sign that has an advertising component is still primarily an Identification Sign, rather than simply advertising. Accordingly, the failure to apply a longevity requirement to all signs in the City of Pittsburgh is not evidence of improper subjectivity.

[8] Melrose brings equal protection challenges pursuant to both the Fourteenth Amendment of the United States Constitution and Article 1, § 26 of the Pennsylvania Constitution. Our analysis of Melrose's federal equal protection claims is equally applicable to its equal protection claims under the Pennsylvania Constitution. *Kramer v. Workers' Comp. Appeal Bd.*, 883 A.2d 518, 532 (Pa. 2005); *see also Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 95 n.6 (3d Cir. 2009).

treatment was also motivated by the taxpayer funding of the construction of these other facilities.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation omitted). In *Congregation Kol Ami v. Abington Township*, we discussed the "two-step inquiry" outlined in *City of Cleburne* for reviewing an equal protection challenge to a zoning ordinance. 309 F.3d 120, 136-37 (3d Cir. 2002). This inquiry "properly places the initial burden on the complaining party first to demonstrate that it is 'similarly situated' to an entity that is being treated differently before the local municipality must offer a justification for its ordinance." *Id.* at 137. Our analysis in this case begins and ends at this first step. Melrose has clearly failed to establish that it is similarly situated to those entities whose signs have been approved. As outlined *supra*, Melrose's sign applications simply fail to satisfy the criteria outlined by the Zoning Board for determining whether a sign with advertising aspects can still properly be classified as an Identification Sign.

To the extent that Melrose challenges the criteria themselves, rather than their application to its cases, we reject this argument for the same reason we rejected Melrose's First Amendment claims. Having determined that the criteria are not content-based, but instead facilitate a contextual analysis, we find that they survive scrutiny under the Equal Protection Clause. *See Brown v. City of Pittsburgh*, 586 F.3d 263, 283 (3d Cir. 2009) ("[W]here the state shows a satisfactory rationale for a content-neutral time, place, and manner regulation, that regulation necessarily survives scrutiny under the Equal Protection Clause.") (internal quotation marks and citations omitted).[9]

---

[9] Melrose briefly argues that the District Court made findings of fact that should have been left for the jury and not resolved at summary judgment. However, Melrose fails to actually identify any material factual determinations made by the District Court. Accordingly, we find this argument to be

**IV.**

For the foregoing reasons, we will affirm the District Court's decision granting summary judgment in favor of Defendants.

---

without merit.